HONORABLE FRANKLIN BURGESS

UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF WASHINGTON
AT TACOMA

UNITED STATES OF AMERICA,

Plaintiff,

vs.

LACEY PHILLABAUM,

Defendant.

Cause No. 06-5613FDB

**DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE**

Defendant Lacey Phillabaum, by and through her attorney, Gilbert H. Levy submits the following memorandum in support of her position at sentencing:

## I.    SENTENCING RECOMMENDATION

Defendant requests that she be sentenced to a term of 36 months. Defendant believes a sentence at the low end of the range is justified because the offense was an isolated incident, she has lived a law-abiding life for the last seven years, and she has fully cooperated with authorities. Defendant requests that the Court recommend that she serve her sentence at Geiger Field so that she can be close to her family and that she be permitted to self-surrender to the designated institution. Following incarceration, Defendant recommends a three-year term of supervised release.

DEFENDANT'S SENTENCING
MEMORANDUM - 1

M:\LEVY\Phillabaum\sentence_memo_2.doc

***Gilbert H. Levy***
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

## II.    BACKGROUND OF THE DEFENDANT

Lacey grew up in Spokane, where five generations of her family have lived. She has an older sister and two younger brothers. As early as the third grade, educators identified Lacey as a gifted student and placed her in more challenging programs. In 1993, she graduated from Shadle Park High School, the same public school her parents attended, where she excelled in academics and debate.

After high school, Lacey attended the University of Oregon at Eugene. She helped pay for her college tuition with academic scholarships and by working part-time as a legal secretary. She pushed herself to work at an accelerated pace and received a Bachelor of Arts degree in Art History in three years. She graduated cum laude in 1996.

Her close-knit family and academic successes opened doors but also meant Lacey was more sheltered and less experienced than the average young adult headed to college. The culture she encountered in Eugene in the 90's was markedly different from that of her more conservative upbringing in Spokane in the '80s. In Eugene, Lacey continued an earlier interest in civics, volunteering for student organizations. Through campus groups, she first came into contact with the environmental protest movement.

Lacey accepted her first job after graduation at the *Earth First Journal*. Over her two-year tenure, Lacey guided the paper to financial stability and new prominence. That recognition made her prominent in Earth First despite her short association with the group. Bill Rodgers and other experienced and influential activists sought her out.

By 1999, Lacey was worn out by the long hours and unremittingly bleak news about the environment at the journal and she quit. Staying at her sister's home in England, she traveled in

DEFENDANT'S SENTENCING
MEMORANDUM - 2

M:\LEVY\Phillabaum\sentence_memo_2.doc

*Gilbert H. Levy*
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

Europe and rekindled her interest in art history. She thought she was done with the radical environmental movement.

She returned to the Northwest in the fall of 1999, still with an interest in environmentalism, but with a different perspective. She was disinterested in the repetitive tactics of the protest movement and wanted to inspire and engage more people.

Lacey became involved in protests over fair trade at the World Trade Organization meeting in Seattle, where she became reacquainted with William Rodgers, also known as "Avalon." She believed that Rodgers was likewise casting about for a new strategy and was open-minded toward that end. She did not know at the time that Rodgers had already recruited many other impressionable young activists into committing acts of arson. Within a year and a half of her return to the United States, Rodgers had channeled Lacey's energy toward the group that committed the University of Washington arson.

Lacey had been involved in many civil disobedience protests and she'd been part of an action where plants were pulled out of fields, but the University of Washington arson was an entirely new, unprecedented and isolated offense. It was aberrant behavior. Of the nineteen people indicted in the Oregon and Washington conspiracies, she is the sole person who was involved in only one arson.

As a result of her experience with the University of Washington arson, Lacey was literally scared straight. As she testified, when she heard the firefighters' radio calls, she knew she had gone much too far. She realized she had put other peoples' lives in danger, and she immediately began cutting her ties to the ELF.

Six months after the arson, Lacey moved from Eugene to Bend, Oregon, and left behind no

DEFENDANT'S SENTENCING
MEMORANDUM - 3

M:\LEVY\Phillabaum\sentence_memo_2.doc

*Gilbert H. Levy*
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

forwarding address. She understood that it wasn't just the people in the conspiracy who had influenced her, but the subculture of radical environmentalism and its many ELF sympathizers.

In the four and a half years after the crime and before the arrests, Lacey re-oriented her life. While in Bend, she worked full-time as an editor for the trade paper of Oregon Tilth, a certifier of organically farmed products. She worked hard at establishing genuine journalistic credentials, and she took on a second job, freelance reporting for the local weekly. She was active in outdoor sporting communities, and she volunteered for a literacy program, reading with disadvantaged schoolchildren.

In 2005, Lacey secured a full-time job as a reporter with *C-Ville Weekly* in Charlottesville, Virginia. She later began working as a free-lance journalist in the larger Washington, D.C., media market. Her articles appeared in respected Baltimore and D.C. weeklies that pass through the hands of a quarter million people.

Lacey also volunteered for the First Amendment Task Force of a journalism trade organization and that interest led to a part-time job with the Coalition of Journalists for Open Government (CJOG), comprised of the largest news organizations in the country. Again, she was working 60-hour weeks at two journalism jobs. At CJOG, she conducted a computer-assisted reporting project to support reforms in the Freedom of Information Act (FOIA). The data she produced was cited by *The New York Times* as fundamental to the passage of FOIA reform legislation.

By this point in her life, Lacey had transitioned from radical environmentalist to someone who still wished to affect societal change, but peacefully, within the confines of the law. In December 2005, when the FBI made the first arrests in the case, Lacey was an accomplished,

DEFENDANT'S SENTENCING
MEMORANDUM - 4

M:\LEVY\Phillabaum\sentence_memo_2.doc

*Gilbert H. Levy*
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

articulate professional with a promising career in journalism.

Immediately after being contacted by the FBI, Lacey began to cooperate. FBI Agent Halla called her in Idaho on Saturday of a three-day holiday weekend, and by the start of business on Tuesday morning she was in Seattle, making a truthful and complete disclosure of her unlawful conduct and the unlawful conduct of others to the US Attorney. Thereafter, she met with the Government's counsel on numerous occasions to assist with the investigation and in preparation for her testimony in the Briana Waters' trial. Lacey went well beyond what is normally expected of someone seeking a downward departure for substantial assistance. It was through Lacey's recollection that investigators were able to recover the rental car receipt that was the main piece of corroborating evidence against Waters.  In Waters' pre-trial conference the government identified this receipt as "incredibly central to the Government's case, incredibly critical and incredibly probative."

During the Waters' trial, Lacey spent an excruciating six hours on the witness stand, enduring a humiliating cross-examination by Waters' defense counsel, Robert Bloom. The Government's strategy was to give Waters' attorney free rein on cross-examination without objection. Waters' attorney was permitted to inquire into intimate details of Lacey's personal life and falsely depict her as promiscuous in front of the public, the media, her friends and family. The Government has called it "character assassination of trial witnesses that resembled the attacks on victims in rape trials."

Lacey's testimony in the Water's trial was instrumental in enabling the Government to secure a conviction. There were problems with both Robert Corrina and Jennifer Kolar's credibility. The corroboration was minimal. Without Lacey, the Government wouldn't have had much of a

DEFENDANT'S SENTENCING
MEMORANDUM - 5

M:\LEVY\Phillabaum\sentence_memo_2.doc

*Gilbert H. Levy*
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

case.

Lacey has done what one would expect of a genuinely remorseful offender. She withdrew from the conspiracy and committed no further offense. She told the truth. She aided the investigation and testified honestly and with no personal agenda. She has written to the researchers and apologized. She has been diligent in seeking to understand the damages caused by her offense. She has complied with the conditions of her pre-trial release.

In January 2007, Lacey elected to turn herself in and begin serving her sentence at FDC SeaTac so that she and the victims could begin to put this episode behind her. She was released shortly after the Waters' verdict, after serving approximately fourteen months. (She sought release at that time in order to take advantage of a Bureau of Prisons self-surrender policy, which may favorably affect her security classification.) The period that she spent in the Federal Detention Center at SeaTac prior to her release was "hard time." Inmates at SeaTac cannot go outside, and there are almost no medical, educational or work programs for pre-trial detainees. Lacey made the most of her time at the Federal Detention Center by helping others and by working on a community service project. Her unprecedented willingness to self-surrender prior to imposition of sentence provides a strong indication her level of personal responsibility and her willingness to pay for her crime.

Lacey's attempts to turn her life around and reject violent tactics long preceeded the day when the FBI first contacted her. Hers is not a last minute conversion on the jailhouse steps. Lacey now stands before the Court as someone with deep remorse who has done everything within her power to make amends. In an act of youthful folly she committed a terrible crime, but she is, in general, a kind, loving person of high integrity with a strong commitment to help others. The

DEFENDANT'S SENTENCING
MEMORANDUM - 6

M:\LEVY\Phillabaum\sentence_memo_2.doc

*Gilbert H. Levy*
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

numerous letters of support accompanying this memorandum demonstrate this. She deserves to be punished but also the opportunity to have some kind of life in the future.

### III.    UNRESOLVED OBJECTIONS TO PRE-SENTENCE REPORT

#### A.    Role in the Offense

Defendant objects to the failure to award a downward adjustment for minimal participation. Compared to other members of the conspiracy, Lacey's role was extremely limited. Defendant Kolar does not remember Lacey's minimal involvement in the crime. Lacey was recruited at the last minute to participate in the Urban Horticulture fire. She did not participate in the planning. She did not manufacture the incendiary device. She did not possess a special skill. She did not recruit others, rent the getaway car or provide a residence where other members of the conspiracy could meet. Her role in the Urban Horticulture fire was that of someone who was present and ready to assist. She had no involvement in other arsons. Her previous "actions" consisted of destroying canola plants and an aborted attempt to destroy genetically engineered poplar trees by removal of bark. Of all the defendants indicted in connection with this investigation, she is the only one involved in a single arson.

USSG § 3B1.2. allows for a four-level departure for a minimal role in the offense or a two-level departure for a minor role. To qualify for the latter adjustment, a defendant must be "less culpable than most other participants." The Pre-Sentence Report acknowledges that Lacey "played a minor role in the offenses" of which she was a part. The Government sentencing memo in the Waters' case indicates that "Waters' role was *far larger* than that of Phillabaum." Lacey was clearly less involved than Solondz, who built the devices, or Rodgers, who made the

DEFENDANT'S SENTENCING
MEMORANDUM - 7

M:\LEVY\Phillabaum\sentence_memo_2.doc

*Gilbert H. Levy*
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

plan, recruited the participants, and placed and set the devices. By definition, Lacey is less cupable than "most other participants" and should qualify, at least, for a minor role adjustment. [1]

B.    Length of Period of Supervised Release

U.S. Probation is incorrect in suggesting that the term of supervised release, "shall be five years," as stated in paragraph 52 of the Pre-Sentence Report. Title 18 United States Code § 3583(b)(1) provides:

Except as otherwise provided, the authorized terms of supervised release are –

(1) for a class A or a Class B felony, **at least three years not more than five years.**

Thus the Court is under no obligation to impose a term of supervised release of five years and may, under the applicable guideline, impose a three-year term. Furthermore, if the Government makes a substantial assistance motion, the Court may impose a shorter term of supervised release. Application Note 3 to USSG 5D1.2 provides:

Upon motion of the Government, a defendant who has provided substantial assistance in the investigation or prosecution of another person who has committed an offense may be sentenced to a term of supervised release that is less than any minimum required by statute or the guideline.

Under Defendant's USSG § 11(c)(1)(C) plea agreement, the Court has limited ability to craft a sentence proportionate to other Defendants'. Defendant Waters and all of the Defendants in the Oregon case were sentenced to three years supervised release. Given the Defendant's conduct both before and after she was contacted by the FBI, and given the nature of her

---

[1] U.S. Probation declined the adjustment, stating that Lacey was "actively involved in at least three offenses intended to promote the … beliefs of the group she belonged…. She was an average participant, personally involved in multiple crimes." The two other offenses mentioned were not claimed by the ELF and were not associated with the group or its beliefs. They are uncharged petty vandalism that Lacey disclosed in making a complete disclosure. Even evaluating those offenses, Lacey was less involved than the average participant in the ELF conspiracy, all of whom, but for her, were involved in multiple arsons and numerous additional felonies.

DEFENDANT'S SENTENCING
MEMORANDUM - 8

M:\LEVY\Phillabaum\sentence_memo_2.doc

*Gilbert H. Levy*
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

assistance, Defendant requests that the Court impose a three-year term of supervised release.

The Government has agreed to join in this request.

C.    Terrorism Enhancement

Defendant maintains her objection to the terrorism enhancement as provided in USSG

3A1.4. That section provides:

> (a) If the offense was a felony that involved or was intended to involve a federal crime of terrorism, increase by 12 levels, but if the resulting offense is less than 32, increase to level 32.

> (b) In each such case, the defendant's criminal history from Chapter Four (Criminal History and Criminal Livelihood) shall be category VI.

According to application note 1 to § 3A1.4, "federal crime of terrorism" is defined in

Title 18 United States Code § 2332b(g). In order to qualify as a "federal crime of terrorism"

under subsection (A) of that statute, the offense must be one that is "calculated to influence or

affect the conduct of government by intimidation or coercion or to retaliate against government

conduct." In addition, the offense must be one that is specifically listed under subsection (B),

which includes violations of Title 18 United States Code § 844(i), to which Defendant entered a

plea of guilty in this case.

Defendant objects to the application of this guideline because there is insufficient

evidence to establish that she intended to "influence or effect the conduct of government." The

determination of the motivational element of the terrorism enhancement is fact specific and

requires consideration of the relevant evidence at sentencing. *United States v. Thurston,* 2007

WL 1500176 (D. Oregon 2007). Furthermore, the Government is obligated to prove the

existence of the enhancement by a higher standard of proof - clear, cogent and convincing

evidence - because the enhancement has an extremely disproportionate effect on the sentence

DEFENDANT'S SENTENCING
MEMORANDUM - 9

M:\LEVY\Phillabaum\sentence_memo_2.doc

*Gilbert H. Levy*
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

relative to the offense of conviction. *United States v. Thurston, supra,* citing *United States v. Jordan,* 256 F. 3d 922 (9th Cir. 2001) and *United States v. Hopper,* 177 F. 3d 824, 833 (1999). In this case, the University of Washington Urban Horticulture Center is an educational and research institution and not an institution of government. It does not legislate, and does not make or execute governmental policy. The fact that it is subsidized by public money does not change its status as an educational institution. The term "government" is not defined in the statute and is ambiguous. The rule of lenity requires the court to limit the reach of criminal statutes to the clear import of their text and to construe any ambiguity against the prosecution. *United States v. Romm,* 455 F. 3d 990, 1001 (9th Cir. 2006). The only evidence to support the prosecution's claim in regard to the Defendant's intent is the so-called communiqués that were issued by members of the group following the arson. There is no reference in either of these documents to the legislative or executive branches of government. These nebulous documents do not reflect anyone's intent and are insufficient to meet the higher standard of proof imposed on the Government in this case.

In any event, the Court should depart downward because Criminal History Category VI over-represents the seriousness of the Defendant's criminal history. USSG § 4A1.3(b) permits a downward departure if the Defendant's criminal history category substantially over-represents the seriousness of the Defendant's criminal history or the likelihood that the Defendant will commit other crimes in the future. Defendants in the related Oregon case, who committed multiple arsons, did have their criminal history adjusted downward on this basis. Several courts have recognized that the power to depart downward due to over-representation of criminal history in cases in which the terrorism enhancement applies. *United States v. Meskini,* 319 F. 3d

DEFENDANT'S SENTENCING
MEMORANDUM - 10

M:\LEVY\Phillabaum\sentence_memo_2.doc

*Gilbert H. Levy*
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

88, 92 (2nd Cir. 2003); *United States v. Thurston, supra, United States v. Benkahla,* 501 F. Supp. 2d 748, 758, 759 (E.D. Virginia 2007). In *Benkhala,* the Court departed downward because the defendant had no prior criminal history and because there was no reason to believe that he would ever commit another crime upon his release from prison. Similarly, the Defendant in this case has no prior criminal history. Furthermore, her background, her cooperation, and her otherwise exemplary behavior both before and after she was convicted all point to the inevitable conclusion that she will never re-offend.

Because the Bureau of Prisons uses the criminal history category in determining security classification, a Category VI Criminal History may cause the Defendant to be designated to a high-security institution. The Court should therefore depart downward and place the Defendant in Criminal History Category I.   The Government has agreed that it will not oppose this request.

### E.  Self Surrender

The Defendant should be permitted to remain out of custody pending designation by the Bureau of Prisons. She has faithfully complied with all conditions of her personal recognizance release. Following the Waters trial, she was released from custody without objection. The Government does not oppose self-surrender.

IV.        BASIS OF SENTENCING RECOMMENDATION

In addition to the Defendant's general good character, her remorse, her minimal role in the U.W. arson, and her extraordinary cooperation, other reasons favor the Defendant's proposed sentencing recommendation. First, there is the matter of proportionality. The following is a rough summary of the sentences imposed in the related cases in this District and the District of Oregon:

Meyerhoff – pleaded guilty to ten arsons, extensive cooperation – 156 months.

DEFENDANT'S SENTENCING
MEMORANDUM - 11

M:\LEVY\Phillabaum\sentence_memo_2.doc

*Gilbert H. Levy*
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

Tubbs – pleaded guilty to ten arsons, cooperated then recanted – 151 months

Gerlach – pleaded guilty to seven arsons, cooperated then recanted – 108 months

Block – two arsons and no cooperation – 92 months

Zacher – two arsons and no cooperation – 92 months

McGowan – two arsons and no cooperation – 84 months

Savoie – two arsons, cooperated but did not testify – 51 months

Paul – one arson, no cooperation – 51 months

Tankersley – one arson, one attempted arson, cooperated but did not testify– 41 months

Thurston – one arson, extensive criminal history, cooperated then recanted – 37 months

Ferguson – involved in over 12 arsons, pleaded guilty to 2, first to cooperate – 5 years probation

Kolar – four arsons, cooperated and testified – 60 months

Waters – convicted after trial and after committing perjury on the stand – 72 months

Lacey is the least culpable of all the defendants, having been peripherally involved in a single arson.[2] No defendant has done more to assist the Government. The Defendant's proposed sentencing recommendation furthers one of the main sentencing goals of Title 18 United States Code § 3553, which is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

The environmental community shunned Lacey as result of her cooperation. Many anonymous threats have been made against her, including that "Lacey Phillabaum deserves absolutely nothing less than a traitor's death," that she should be "rubbed out… that is… shot dead," and encouragement to "let the prison rapes begin." People have collected photos of her and details of where and when she travels, and posted them online. She fears reprisals. In part because this is such a high-profile case, Lacey is paying a heavy price for her cooperation.

---

[2] Defendant Thurston was convicted in one count of arson in the Oregon case but has an extensive criminal history in Canada, including previous ALF-associated arson convictions.  Defendant Paul, likewise, has a single arson conviction in this case but has previously been indicted for separate ALF arsons.  Defendant Waters has a single conviction but is a suspect in a second arson in Litchfield, California.

DEFENDANT'S SENTENCING
MEMORANDUM - 12

M:\LEVY\Phillabaum\sentence_memo_2.doc

*Gilbert H. Levy*
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

Unlike the Oregon defendants, Lacey was required to plead guilty to the 18 United States Code § 924(c) count – use of a destructive device – as a condition of her plea agreement. This, coupled with the terrorism enhancement, all but insures that she will have a longer period of supervised release, supervised release with special conditions, and possible designation to a high-security institution. There are important collateral consequences of the conviction, which will follow Lacey after sentencing and probably for the rest of her life. Wherever she goes and whatever job she applies for, she faces the stigma of having been labeled both a bomber and a terrorist. In a very real sense, Lacey is being punished more severely than other defendants who committed multiple arsons and declined to cooperate. If the Court wishes to avoid sentence disparities, it should consider these collateral consequences.

## V.    RECOMMENDATION FOR PLACE OF CONFINEMENT

Due to the serious nature of the crimes of which Lacey has been convicted, the Court is respectfully requested to weigh in forcefully in regard to the place of confinement. The Bureau of Prisons has limited options for female prisoners. Several other female members of the conspiracy have already been assigned to FCI Dublin. Briana Waters requested designation to Dublin. There is no other FCI that accommodates female prisoners in the Western Region. Because of the 924(c) conviction and because of the terrorism enhancement, Lacey could wind up serving the balance of her sentence at a high-security institution far from family and friends. Because of her cooperation, Lacey faces a threat from other prisoners if placed in a high-security institution. While the Bureau is not required to adhere to the Court's recommendation, it nevertheless gives it careful consideration. The State facility at Geiger Field currently accepts female federal prisoners. This would enable Lacey to remain close to her family in Spokane. The Court is requested to recommend placement at Geiger and to make a finding in the judgment that Geiger would be an appropriate placement. The Court agreed to make similar findings for former co-conspirator Jennifer Kolar.

DEFENDANT'S SENTENCING
MEMORANDUM - 13

M:\LEVY\Phillabaum\sentence_memo_2.doc

*Gilbert H. Levy*
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

VI.    <u>CONCLUSION</u>

Defendant requests a sentence of 36-months incarceration at Geiger field. Defendant requests a three-year period of supervised release. Defendant requests that the Court suspend restitution pending her release from custody and waive interest.

The Court should adopt the Defendant's sentencing recommendation.

DATED: August 13, 2008.

/s/ Gilbert H. Levy
Gilbert H. Levy, WSBA #4805
Attorney for Defendant

DEFENDANT'S SENTENCING
MEMORANDUM - 14

M:\LEVY\Phillabaum\sentence_memo_2.doc

**Gilbert H. Levy**
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670 Fax: (206) 448-2252

CERTIFICATE OF SERVICE

I certify that on August 13, 2008, I caused to be electronically filed the forgoing document with the Clerk of Court using the CM/ECF system, which will send notification of such filing to the attorney(s) of record.

/S/  Gilbert H. Levy
Gilbert H. Levy  WSBA# 4805
Attorney for Defendant Lacey Phillabaum

Certificate of Service

**Gilbert H. Levy**
Attorney at Law
200 Market Place Two
2001 Western Avenue
Seattle, Washington 98121
(206) 443-0670  Fax: (206) 448-2252